## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JASON BISHOP,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No.: 15-cv-6069** |
| | : | |
| **UPPER DARBY POLICE DEPT., et al.,** | : | |
| **Defendants.** | : | |

## <u>MEMORANDUM</u>

**SITARSKI, M.J.**                                                    **October 14, 2021**

Presently pending before the Court is Defendants' Motion for Summary Judgment (Mot. for Summ. J., ECF No. 78), Plaintiff's response thereto (Resp., ECF No. 80) and Defendants' reply in support of their motion.  (Reply, ECF No. 81).  For the reasons that follow, Defendants' motion is **GRANTED in part** and **DENIED in part**.

## I.     FACTS[1]

On May 26, 2015, Plaintiff Jason Bishop's stepdaughter, Shervon Douglas, drove to his and his girlfriend's home at 6955 Clinton Road in Upper Darby, Pennsylvania, to drop off her daughter before reporting to work at the Philadelphia Airport.  (Bishop Tr., ECF No. 78-1, at 19:9-24, 20:11-13, 38:17-39:19, 40:10-14).  After dropping off her daughter, Douglas asked

---

[1]  As required at this stage of the proceedings, the Court views the evidence in the light most favorable to Bishop, as the nonmovant.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).  However, as Defendants note in their reply, Bishop's unverified Second Amended Complaint, although repeatedly cited in his Counterstatement of Facts and opposition brief, does not constitute evidence.  *See Parkell v. Danberg*, 833 F.3d 313, 320 n.2 (3d Cir. 2016) (only complaints and other filings verified under penalty of perjury may constitute evidence).  Accordingly, the Court does not consider any allegations contained therein that lack support in the record.

Bishop to ride with her to the airport "because the cops . . . were double-parked in front of the house."[2]  (*Id.* at 40:10-15).  This section of Clinton Road allows for only a single lane of one-way traffic such that Douglas's vehicle could not proceed further.  (*See* Bishop Tr., ECF No. 78-1, at 41:17-42:2).  Nor could she reverse her vehicle because several vehicles had pulled up behind hers.  (*Id.* at 47:19-20).

Bishop exited the house and entered Douglas's vehicle, sitting in the passenger seat.  (*Id.* at 46:19-22).  He asked her to honk the horn or to ask the police to pull to the side of the street. (*Id.* at 47:3-8).  She refused.  (*Id.* at 47:4-9).  Bishop then partially exited the vehicle with one foot still inside it, stood up and "politely" asked Upper Darby Police Officers Michael T. Dockery, Jr., and Brian Gieder, who were "talking and lollygagging" on the opposite sidewalk, "if they could kindly pull to the side seeing there was not an emergency,[3] because [the police vehicles] never had their emergency lights on and people have to go to work."  (*Id.* at 47:10-15). Bishop pointed out that "there is enough parking that they can park to the side" and that Douglas could not back up because of the number of vehicles behind hers.  (*Id.* at 47:15-20).  He then stated, "People do have to go to work and people do pay taxes on the block."  (*Id.* at 47:21-22). In response, Dockery "angrily" ran over to Bishop, stood on the opposite side of the open passenger door and continued to repeat, "Give me your ID or I'm going to take you to jail."  (*Id.* at 47:22-48:1, 49:17-21, 51:3-6, 51:16-18).  Bishop replied, "I'm not going to give [you] any ID

---

[2]  Bishop's Counterstatement of Facts indicates that, in light of the police activity, Douglas had concerns about arriving late to work if she parked in a remote lot at the airport as she had planned and that she asked Bishop to accompany her so that he could instead return with her vehicle.  (Counterstatement of Facts, ECF No. 80-3, at ¶ 3).  However, Bishop's cited deposition testimony does not support this allegation, and the Court could not locate supporting testimony elsewhere in the deposition transcript.  (*See id.* (citing Bishop Tr., ECF No. 78-1, at 47:19-52:19, 53:18-54:22)).

[3]  Although Bishop would not have known at the time, the police were on the scene responding to a landlord-tenant dispute.  (Dockery Tr., ECF No. 78-1, at Ex. 1).

because me asking you politely to pull to the side of the street does not require me to produce any ID. I didn't break any laws." (*Id.* at 49:21-50:1). Dockery continued to demand Bishop's identification upon threat of taking him to jail. (*Id.* at 51:21-23, 53:21-22). Bishop refused and eventually began walking back to the sidewalk in front of his home. (*Id.* at 53:23-54:1). Dockery followed Bishop and told him that he was the one holding up traffic now. (*Id.* at 54:1-3). Bishop asked how that was possible when the officers were still parked in the middle of the street. (*Id.* at 54:3-6).

Bishop turned around when he reached the sidewalk and Dockery was standing within six inches of him, continuing to insist that Bishop produce his identification. (*Id.* at 54:6-8, 55:4-6). Plaintiff refused. (*Id.* at 54:11). Dockery was "very angry" and "asked [Bishop] if [he] lived in Upper Darby and if [he] pa[id] taxes in Upper Darby," to which Bishop responded that that "was none of his concern." (*Id.* at 54:11-15). Bishop then turned around because he heard the wind chimes on his front door as it was opened by his girlfriend. (*Id.* at 54:16-19, 55:9-14). At this point, Dockery grabbed Bishop by the right hand, pulled it "really bad" up to his left shoulder and arrested Bishop, "squeezing the handcuffs really tight on [his] hand." (*Id.* at 54:18-22, 55:15-19). Dockery informed Bishop he was issuing him a citation for disorderly conduct. (*Id.* at 58:11-12). Bishop asked, "What kind of bullshit citation are you trying to give to me?" (*Id.* at 58:12-14). Dockery replied that Bishop was using obscene language. (*Id.* at 58:14-15). At this point, Gieder, who had remained on the sidewalk the entire time and never said anything to Bishop, walked over behind Dockery. (*Id.* at 50:19-24,58:16-17). Bishop stated to Dockery: "The last time I looked in the Oxford and the Webster's dictionary . . . bullshit was not obscene." (*Id.* at 58:17-21). Bishop does not know or cannot recall where Officers Louis Garay, Jr., and Kevin Donohue were throughout these events. (*Id.* at 56:19-57:23).

Dockery placed Bishop in Gieder's patrol car.  (*Id.* at 55:19-22).  Gieder immediately began driving Bishop to the police station in his patrol car, with Dockery following in his.  (*Id.* at 56:2-4).  The drive to the station took four to five minutes.  (*Id.* at 59:9-13).  Along the way, Gieder asked Bishop if he had any warrants.  (*Id.* at 59:15-16).  He responded, "even if I had warrants, that wasn't the point.  The point was I didn't break any laws to produce any ID."  (*Id.* at 59:16-20).  Gieder "blasted" the radio and the discussion ceased.  (*Id.* at 59:20-22).  Once at the station, Dockery removed Bishop from Gieder's car and took him inside.  (*Id.* at 60:15-23).  Bishop asked Dockery "if [he] could please get some medical attention because [his] hand was in severe pain."  (*Id.* at 61:8-10).  Bishop did not tell Dockery why his hand hurt.  (*Id.* at 61:19-22).  Dockery refused, stating that Bishop did not need medical attention.  (*Id.* at 61:10-11).  Bishop then asked if a supervisor was on duty, but Dockery replied that one was not.  (*Id.* at 61:17-18).  He placed Bishop in a small cell with a window and walked away.  (*Id.* at 62:4-9, 65:19).  Bishop asked an unidentified officer on the other side of the window "if he could please loosen the handcuffs on [his] hands because [his] hands were in extreme pain."  (*Id.* at 62:10-13).  The officer responded that only the officer who had placed Bishop in the cell could do that.  (*Id.* at 62:13-15; 64:7-16).

Dockery returned.  (*Id.* at 65:19).  Bishop asked if he was under arrest; Dockery responded, "yes."  (*Id.* at 65:20-22).  Bishop directed Dockery to his identification in his pants pocket.  (*Id.* at 65:22-23).  Dockery removed the identification, left and returned, removed the remaining contents of Bishop's pockets, placed them in a bag, and then removed Bishop's handcuffs.  (*Id.* at 66:9-11, 66:18-67:22).  Dockery left with the bag[4] and returned with a citation for disorderly conduct.  (*Id.* at 58:11-12, 68:21-22).  He asked Bishop to sign it, but he refused.

---

[4] Bishop received his belongings back at an unspecified later point.  (Bishop Tr., ECF No. 78-1, at 68:15-17).

(*Id.* at 68:21-22).  Dockery gave Bishop a copy of the citation and released him.  (*Id.* at 69:6-12).

Bishop was at the police station "longer than 30 minutes."  (*Id.* at 69:23-70:6).

Upon his release, Bishop went to the emergency room because his hand "was in

excruciating pain."  (*Id.* at 71:13-15).  He told the medical staff that he had been handcuffed too

tightly on his right wrist bone and that he had unresolved but improving numbness in his fourth

and fifth fingers on that hand.  (Emer. Dep't Rec., ECF No. 78-3, at Ex. 7, at 1).  He rated his

pain as six on a scale of one-to-ten.  (*Id.* at 2).  Abrasions and redness on his wrist were noted,

and he was given an ice pack and a Motrin and discharged.  (*Id.* at 1, 3-4).

Bishop attended a hearing on the citation some time prior to August 2015.  (*Id.* at 71:21-

23, 77:4-10).  Dockery and he both testified.  (*Id.* at 74:11-19).  At some point after the hearing,[5]

the judge dismissed the case.  (*Id.* at 74:22-24).


## II.    PROCEDURAL HISTORY

Bishop commenced this action, *pro se,* by filing a Complaint against Dockery, Gieder,

Garay, Donohue and the Upper Darby Police Department (UDPD) on December 14, 2015.

(Compl., ECF No. 3).  On July 22, 2016, Bishop filed an Amended Complaint, adding Upper

Darby Police Superintendent Michael Chitwood, Upper Darby Township (Township), and the

Upper Darby Board of Supervisors (Board) as defendants.  (Am. Compl. ECF No. 17).

Subsequently, court-appointed counsel entered an appearance on behalf of Bishop and filed a

Second Amended Complaint.  (Orders, ECF Nos. 22, 24, 26; Sec. Am. Compl., ECF No. 47).

The Second Amended Complaint contained the following ten counts:

(1)    Fourteenth Amendment due process claim against Dockery and the UDPD
       pursuant to 42 U.S.C. §1983 (Count I);

---

[5]  At his deposition, Bishop could not recall if the dismissal was immediate or effective
after a three-month "cooling-off" period.  (*Id.* at 76:3-10).

(2)     Fourth and Fourteenth Amendment claims against the individual defendants and the UDPD pursuant to 42 U.S.C. §§ 1983 and 1985 (Count II);

(3)     Fourth Amendment False Arrest claim against the individual defendants and the UDPD pursuant to § 1983 (Count III);

(4)     False arrest claim based on Pennsylvania law against the individual defendants and the UDPD (Count IV);

(5)     Malicious Prosecution claim against the individual defendants and the UDPD pursuant to 42 U.S.C. §1983 (Count V);

(6)     Malicious Prosecution claim based on Pennsylvania law against the individual defendants and the UDPD (Count VI);

(7)     Assault and Battery claim against Dockery based on Pennsylvania law (Count VII);

(8)     False Imprisonment claim based on Pennsylvania law against the individual defendants and the UDPD (Count VIII);

(9)     False Arrest and False Imprisonment pursuant to 42 U.S.C. §§ 1983, 1985(3), 1986, and 1988 against the individual defendants and the UDPD (Count IX); and

(10)    Conspiracy to Violate Bishop's Civil Rights against all Defendants (Count X).

(Sec. Am. Compl. Counts I-X).

On July 20, 2017, Defendants filed a motion to dismiss the Second Amended Complaint in part, to which Bishop responded on August 8, 2017.  (Mot. to Dism., ECF No. 48; Resp. to Mot. to Dism., ECF No. 50).  On May 24, 2018, the Court issued a Memorandum and Order granting in part and denying in part the motion to dismiss.  (Memo., ECF No. 56; Order, ECF No. 57).  The Court dismissed: (1) the claims against the UDPD, the Board and Chitwood; (2) the official capacity claims against Dockery, Gieder, Garay, and Donohue; (3) all claims asserted under the Fifth and Fourteenth Amendments to the United States Constitution and all claims asserted under 42 U.S.C. Section 1985;[6] (4) the federal malicious prosecution claim (Count V);

---

[6] Bishop agreed to withdraw all such claims, resulting in the dismissal of Counts I and II. (Memo., ECF No. 56, at 4 n.3).  Although Count II references the Fourth rather than the Fifth

and (5) the conspiracy claim (Count X).  (Order, ECF No. 57).  In addition, although Bishop did

not expressly assert a *Monell* claim, the Court construed his official capacity claims against the

individual defendants and his claims against the UPPD as *Monell* claims against the Township.

(Memo., ECF No. 56, at 4 n.3).

On May 13, 2021, the remaining defendants moved for summary judgment as to the

remaining claims.  (Mot. for Summ. J., ECF No. 78).  Bishop filed a response on June 21, 2021,

and Defendants filed a reply on June 29, 2021.  (Resp., ECF No. 80; Reply, ECF No. 81).


## III.    LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  An

issue is "genuine" if there is sufficient evidence from which a jury could find in favor of the non-

moving party.  *Id.*  It is not the court's role to weigh the disputed evidence and decide which is

more probative, or to make credibility determinations.  Rather, the court must consider the

evidence, and all reasonable inferences which may be drawn from it, in the light most favorable

to the non-moving party.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587-88 (citation omitted);

*Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between

the evidence presented by both sides, the court must accept as true the allegations of the non-

---

Amendment, it specifies no specific Fourth Amendment violation, but instead references a
"procedural due process" violation, consistent with a Fifth Amendment claim.  (Sec. Am.
Compl., ECF No. 47, at ¶¶ 48-49).  To the extent that Bishop intended to assert a Fourth
Amendment claim in Count II, this claim would be duplicative of Count III anyway.  (*Id.* at ¶¶
51-55).

moving party, and "all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party carries this initial burden, the non-moving party must "come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions. *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992); *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Instead, the non-moving party must present specific facts and "affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. If the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. *Celotex Corp.*, 477 U.S. at 322-23.

## IV.   DISCUSSION

Bishop does not oppose the entry of summary judgment as to any *Monell* claim asserted by him. (Resp., ECF No. 80, at 7). This concession leaves him with the following claims: (1) false arrest and false imprisonment under Pennsylvania and federal law against the four officers (Counts III, IV, VIII and IX); (2) malicious prosecution under Pennsylvania law against the officers (Count VI); and (3) assault and battery against Dockery (Count VII). In addition, because the Second Amended Complaint can be read as asserting a claim for failure to intervene insofar as it complains primarily about Dockery's actions but also alleges that Gieder, Garay and

Donohue were present but did not assist Bishop, and because both parties have briefed such a claim, the Court shall consider this claim as well.  Finally, the Court considers Defendants' qualified immunity defense to the federal claims lodged against them.

### A.      False Arrest and False Imprisonment

Bishop asserts federal and state false arrest and false imprisonment claims against Dockery, Gieder, Garay and Donohue (Counts III, IV, VIII, IX).  Federal claims for false arrest and false imprisonment under Section 1983 originate from the Fourth Amendment's protection against unreasonable searches and seizures. U.S. Const. amend. IV.  "While courts recognize that false arrest and false imprisonment claims under the Fourth Amendment are nearly identical claims and often analyzed together, they remain distinct causes of action." *Dixon v. Schweizer*, No. 18-cv-5403, 2020 WL 4600187, at *8 (E.D. Pa. Aug. 11, 2020); *see also Cooper v. City of Phila.*, No. 13-6222, 2015 WL 619619, at *3 (E.D. Pa. Feb. 12, 2015) ("False arrest and false imprisonment are 'nearly identical claims' that are 'generally analyzed together.'") (quoting *Karkut v. Target Corp.*, 453 F. Supp. 2d 874, 879 (E.D. Pa. 2006), *Brockington v. Phila.*, 354 F. Supp. 2d 563, 570 n.8 (E.D. Pa. 2005)).  "To succeed on a claim of false arrest for violation of one's right to be free from unreasonable seizure under the Fourth Amendment, a plaintiff must prove (1) that he was arrested, and (2) that the arrest was made without probable cause." *Garland v. Bonds*, No. 2:19-cv-1874, 2020 WL 2126330, at *5 (E.D. Pa. May 5, 2020) (citations omitted).  "Similarly, to succeed on a claim of false imprisonment, a plaintiff must prove that (1) he was imprisoned, and (2) his imprisonment was unlawful." *Id.*

"In Pennsylvania, these two civil causes of action are identical theories of liability.  Both require (1) the detention of another person (2) that is unlawful." *Braswell v. Wollard*, 243 A.3d 973, 979 (Pa. Super. Ct. 2020) (citations and internal quotation marks omitted).  "Generally, to establish liability for false imprisonment [under Pennsylvania law], the plaintiff has to prove that

(1) Defendant acted with the intent to confine Plaintiff within boundaries fixed by him; (2) Defendant's act directly or indirectly resulted in such confinement; and (3) Plaintiff was conscious of this confinement or was harmed by it." *Macolino v. Twp. of Lower Moreland*, No. 18-cv-1476, 2020 WL 5820742, at *9 (E.D. Pa. Sept. 30, 2020).  "[F]alse arrest is an alternative means of establishing liability for false imprisonment but is not itself a tort in the sense of being an independent source of liability." *Dixon*, 2020 WL 4600187, at *7.

"To make out either a false arrest or false imprisonment claim, [a plaintiff] need[s] to demonstrate that his arrest was unsupported by probable cause." *White v. Andrusiak*, 655 Fed. App'x 87, 90 (3d Cir. 2016).  The existence of probable cause is a "complete defense" to false arrest and false imprisonment claims.  *Langford v. Gloucester Twp. Police Dep't*, 787 Fed. App'x 120, 122 (3d Cir. 2019) (citing *Goodwin v. Conway*, 836 F.3d 321, 327 (3d Cir. 2016)). "Generally, 'the question of probable cause in a section 1983 damage suit is one for the jury.'" *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000) (quoting *Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir. 1998)).  "However, a district court may conclude 'that probable cause exists as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding,' and may enter summary judgment accordingly." *Id.* at 788–89 (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997)).

"Probable cause exists if there is a 'fair probability' that the person committed the crime at issue." *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000) (quoting *Sherwood*, 113 F.3d at 401).  Put another way, "probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995).

The Supreme Court prescribes a "totality-of-the-circumstances approach" to the probable cause determination. *Illinois v. Gates*, 462 U.S. 213, 230 (1983). As the Third Circuit has explained:

> While it is axiomatic that at the summary judgment stage, a court must view the facts in the light most favorable to the nonmoving party, it does not follow that we exclude from the probable cause analysis unfavorable facts an officer otherwise would have been able to consider. Instead, we view all such facts and assess whether any reasonable jury could conclude that those facts, considered in their totality in the light most favorable to the nonmoving party, did not demonstrate a "fair probability" that a crime occurred. Only then would the existence of conflicting evidence rise to the level of a "genuine dispute as to any material fact" such that summary judgment would be inappropriate. Thus, where the question is one of probable cause, the summary judgment standard must tolerate conflicting evidence to the extent it is permitted by the probable cause standard.

*Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468 (3d Cir. 2016).

Defendants contend that probable cause existed to arrest and detain Bishop because he refused to provide his identification to Dockery. (Memo. in Supp. of Mot. for Summ. J., ECF No. 78, at 19). According to them, "[t]he question here is not whether or not Plaintiff was guilty of disorderly conduct but whether or not Officer Dockery had a reasonable belief that Plaintiff violated the disorderly conduct statute and had a right to identify Plaintiff." (*Id.*). Alternatively, they state the issue as "not whether Plaintiff was acting in a fashion which was disorderly under the statute," but "whether or not taking him into custody for the purpose of identifying him in order to cite him was reasonable under the 4th Amendment." (*Id.*). Defendants maintain that if Bishop had provided his identification as requested, the police would have mailed the citation to him later rather than taking him into custody at the scene. (*Id.*). They cite *Crock v. Pennsylvania*, 397 F. App'x 747 (3d Cir. 2010) (per curium) for the proposition that a request for identification is not a seizure under the Fourth Amendment. (*Id.* at 19-20).

Bishop contends that Defendants attempt to use his refusal to produce identification as a pretext for his subsequent arrest and detention when, in fact, he was charged with disorderly conduct, not failure to produce identification. (Resp., ECF No. 80, at 7). He argues that, taking the evidence in the light most favorable to him, no probable cause for his arrest and detention existed. (*Id.* at 7-8).

Taking the facts in the light most favorable to Bishop, the Court agrees that Dockery lacked probable cause to arrest and detain Bishop. According to Bishop, he "politely" asked Dockery and Gieder "in a very calm voice" "if they could kindly pull to the side" to allow traffic to proceed and his stepdaughter to go to work. (Bishop Tr., ECF No. 78-1, at 47:11-15). While his statement about residents of the block paying their taxes was unnecessary, nothing Bishop said or did, as described by Bishop, would have led Dockery reasonably to believe that there was "a fair probability" that Bishop had committed any crime. *See Wilson*, 212 F.3d at 789; *Orsatti*, 71 F.3d at 483. The disorderly conduct statute, in particular, requires one of the following: (1) fighting,[7] threatening, or violent or tumultuous behavior; (2) making unreasonable noise; (3) using obscene language or gestures; or (4) creating an unnecessary hazardous or physically offensive condition. 18 PA. C.S. 5303(a)(1)-(4). Taking the evidence in Bishop's favor, none of his actions or statements fall into any of these categories.

Defendants attempt to frame the question as whether Dockery had the right to arrest and detain Bishop for refusing to produce identification. But, under Bishop's facts, Dockery had no basis to demand his identification on pain of arrest in the first place. The police may request identification even when they have no basis to establish probable cause that the person has

---

[7] Bishop claims that he was charged with "disorderly conduct – fighting," but the copy of the citation in the record is illegible. (Citation, ECF No. 78-3, at Ex. 6; Resp., ECF No. 80, at 7).

committed a crime, but only "as long as the police do not convey a message that compliance with their requests is required." *Florida v. Bostick*, 501 U.S. 429, 435 (1991).  Further, "[a]lthough police may request a person's identification, such individual still maintains 'the right to ignore the police and go about his business.'" *Commonwealth v. Lyles*, 97 A.3d 298, 303 (Pa. 2014) (quoting *In re D.M.*, 566 Pa. 445, 781 A.2d 1161, 1164–65 (2001)) (additional citation omitted). This is exactly what Bishop alleges he did here.  Under Defendants' view of the law, the police could demand identification under a threat of arrest without probable cause and then arrest the individual not because he or she may have committed a crime in the first instance, but because he or she had subsequently refused to produce identification.  However, such an interpretation would be tantamount to allowing the police to compel production of identification without basis and ignores the right of the individual to refuse such demands.  *Bostick*, 501 U.S. at 435; *Lyles*, 97 A.3d at 303.

Defendants' reliance on *Crock* is misplaced.  In that case, the plaintiff, Crock, was arrested inside his mother's house under circumstances consistent with a break-in, but she subsequently informed the police that he had her permission to enter, resulting in no charges being brought against him other than one related to his conduct during the arrest.  397 F. App'x at 748.  The following day Crock filed a complaint against the arresting officers at police headquarters.  *Id.*  The sergeant taking his statement asked for identification, saw that Crock had driven to headquarters, determined that the license provided had been suspended and issued him a citation.  *Id.* at 748-49.  Crock sued, alleging, *inter alia*, that he had been subjected to an illegal seizure in violation of the Fourth Amendment when the sergeant "ran his license."  *Id.* at 749-50. The Third Circuit affirmed the district court's entry of summary judgment in favor of the defendants on the claim because "[t]here was no attempt to restrain Crock's liberty."  *Id.* at 750.

In this case, however, no dispute exists that Bishop's liberty was restrained and a seizure occurred: he was arrested and detained for approximately half an hour or more.  (*See* Bishop Tr., ECF No. 78-1, at 69:23-70:6).  Further, to the extent that Defendants seek to draw a parallel between the requests for identification in the two cases, the comparison falls apart upon closer examination.  In *Crock*, the police ostensibly requested identification as part of the complaint process to confirm that Crock was who he said he was, and Crock complied with the request. *See* 397 F. App'x at 748, 750.  If Crock had refused, doing so might have impeded his ability to file the complaint, but there is no indication that he faced "either the application of physical force" or that he was required to "submi[t] to the assertion of authority" necessary to constitute a seizure.  *Id.* at 750 (quoting *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)).  Bishop, on the hand, was repeatedly told by Dockery, "Give me your ID or I'm going to take you to jail."  (Bishop Tr., ECF No. 78-1, at 47:22-48:1, 49:17-21).

Because Dockery lacked probable cause to arrest and detain Bishop, the Court shall deny summary judgment on Bishop's false arrest and false imprisonment claims as to him.  However, the claims as to the other officers require further consideration.  As Defendants observe in their reply, Bishop's Second Amended Complaint largely lumps all four officers together.  (Reply, ECF No. 81, at 2).  However, this practice ignores the fact that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs . . . ."  *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citing *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1082 (3d Cir. 1976)).

Bishop testified that Dockery alone arrested him and that none of the other officers participated.  (Bishop Tr., ECF No. 78-1, at 56:14-16).  Indeed, he does not know or cannot recall where Garay and Donohue were during the events in question, and neither is alleged to have participated in his detention at any point.  (*Id.* at 56:19-57:23).  Conversely, Gieder

detained Bishop during the drive in his patrol car to the police station.  (*Id.* at 59:9-22).  Further, although Gieder was not involved in Bishop's arrest, he was present for it and therefore knew that Bishop's detention was unlawful, assuming the facts to which Bishop testified to be true. (*See id.* at 47:10-15).  Thus, Bishop has adduced evidence in support of his false imprisonment claims or theories of liability against Gieder.  *Garland*, 2020 WL 2126330, at \*5; *Braswell v. Wollard*, 243 A.3d at 979.  Accordingly, the Court will grant summary judgment in favor of all false arrest and false imprisonment claims as to Gieder, Garay, and Donohue except for the false imprisonment claims against Gieder.

### B.    Malicious Prosecution

Bishop also asserts a state law malicious prosecution claim against Dockery, Gieder, Garay and Donohue (Count VI).  In Pennsylvania, "a plaintiff alleging common law malicious prosecution must show (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; and (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice."  *Piazza v. Lakkis*, No.3:11-cv-2130, 2012 WL 2007112, at \*12 (M.D. Pa. June 5, 2012) (quoting *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 791 (3d Cir. 2000)).  "Probable cause in the context of the tort of malicious prosecution does not require proof beyond a reasonable doubt, but rather, is defined as 'a reasonable ground of suspicion supported by circumstances sufficient to warrant an ordinary prudent man in the same situation in believing that a party is guilty of the offense.'"  *Strickland v. Univ. of Scranton*, 700 A.2d 979, 984 (Pa. 1997) (quoting *Cosmas v. Bloomingdales Bros., Inc.*, 442 Pa. Super. 476, 481, 660 A.2d 83, 86 (1995)).  Further, "[m]alice may be inferred from want of probable cause."  *Wainauskis v. Howard Johnson Co.*, 488 A.2d 1117, 1123 (Pa. Super. Ct. 1985) (citing *Hugee v. Pa. R.R. Co.*, 101 A.2d 740, 742 (1954)).

Defendants repeat their argument that probable cause existed because Bishop refused to produce his identification.  (Memo. in Supp. of Mot. for Summ. J., ECF No. 78, at 21). Maintaining that probable cause "exists for any charge that could have been filed against the Plaintiff," they contend that Bishop could have been charged with either disorderly conduct or obstructing the administration of law.  (*Id.* at 21-22 (citing 18 PA. C.S. §§ 5101, 5303 (West 2021); *Barna v. City of Perth Amboy*, 42 F.3d 809 (3d Cir. 1994))).  They observe that the obstruction statute does not require evidence that obstruction actually occurred.  (*Id.* (citing *In re W.N.W.*, No. 1565 MDA 2013, 2014 WL 10919641, at *4 (Pa. June 9, 2014) (internal citation omitted))).  They also point out that malicious prosecution requires that the defendant initiated criminal proceedings against the plaintiff, but Gieder, Garay and Donohue had no involvement in the issuance of the citation.  (*Id.*).  Bishop responds that the issue is whether there was probable cause to arrest him for disorderly conduct and that a genuine issue of material fact exists on that question.  (Resp., ECF No. 80, at 9-10).  He argues that to find otherwise would require the Court to accept as true Defendants' alleged facts, "turn[ing] the standard for summary judgment on its head."  (*Id.* at 9).

The Court has already held that, accepting Bishop's evidence as true, no probable cause existed to arrest him for disorderly conduct or for his refusal to produce his identification, let alone issue him a citation.  (*See supra* § IV.A). But, as noted, Defendants also posit that probable cause existed to charge Bishop with obstruction and that, therefore, his malicious prosecution claim based on his disorderly conduct charge fails.  The Third Circuit has noted the "considerable tension" in its precedent regarding whether the existence of probable cause to be arrested for and charged with one crime precludes a plaintiff from bringing a malicious prosecution claim based upon another charge for which no probable cause existed.  *Kossler v. Crisanti*, 564 F.3d 181, 193 (3d Cir. 2009) (citing *Johnson v. Knorr*, 477 F.3d 75 (3d Cir. 2007);

*Wright v. City of Phila.*, 409 F.3d 595 (3d Cir. 2005)); *see Johnson*, 477 F.3d at 83-85 (analyzing

charges separately); *Wright*, 409 F.3d at 604 (a finding of probable cause as to one charge

disposed of malicious prosecution claim based upon other charges).  However, the instant matter

does not require the resolution of this tension because, construing the facts in the light most

favorable to Bishop, there was also no probable cause to charge Bishop with obstruction.  The

relevant statute prohibits only obstruction "by force, violence, physical interference or obstacle,

breach of official duty, or any other unlawful act . . . ."  18 PA. C.S. § 5101.  Defendants make no

attempt to explain how Bishop engaged in any such behavior when he politely and calmly

requested that Dockery and Gieder pull their patrol cars to the side of the street to allow traffic to

pass.  (Bishop Tr., ECF No. 78-1, at 47:11-15).

On the other hand, Defendants are correct that the defendant on a malicious prosecution

must have initiated criminal proceedings against the plaintiff.  *See Piazza*, 2012 WL 2007112, at

*12.  Indeed, Bishop does not contend otherwise.  (*See* Resp., ECF No. 80, at 9-10).  Nor does he

contend that his citation was issued by anyone other than Dockery. (Bishop Tr., ECF No. 78-1, at

68:21-22, 69:6-12).  Gieder, Garay and Donohue initiated no criminal proceedings against

Bishop.  Accordingly, the Court will deny summary judgment on the malicious prosecution

claim as to Dockery, but grant summary judgment as to Gieder, Garay and Donohue.

### C.    Assault and Battery

Bishop brings an assault and battery claim against Dockery only (Count VII).  Under

Pennsylvania law, "an assault is an intentional attempt by force to do an injury to the person of

another, and a battery is committed whenever the violence menaced in an assault is actually

done, though in ever so small a degree, upon the person."  *Renk v. City of Pittsburgh*, 537 Pa. 68,

641 A.2d 289, 293 (1994) (citing *Cohen v. Lit Bros.*, 166 Pa. Super. 206, 209, 70 A.2d 419, 421

(1950)).  The police may use "reasonable force" to carry out their duties, including when making

an arrest. *Id.* "In making a lawful arrest, a police officer may use such force as is necessary under the circumstances to effectuate the arrest." *Id.* If the force is not reasonable and necessary, the police officer's conduct constitutes an assault and battery. *Id.*

Defendants claim that Bishop lacks any evidence Dockery intended to injure him. (Memo. in Supp. of Mot. for Summ. J., ECF No. 78, at 25). They argue that Dockery's, at most, negligence in allegedly pulling Bishop's arm too far behind his back is insufficient to establish the intentional tort of assault and battery. (*Id.*). They point out that Bishop acknowledges that Dockery used no other force on him, such as striking or pushing him or using a weapon against him. (*Id.*). Bishop counters that "the issue of a police assault and battery claim is intertwined with the lawfulness of the arrest" and that, here, the underlying arrest was not lawful. (Resp., ECF No. 80, at 12 (citing *Cohen*, 70 A.2d at 421)). He further contends that the evidence demonstrates that Dockery "lost his temper and angrily assaulted Bishop" simply because Bishop asked Dockery to move his vehicle. (*Id.*).

Bishop is correct that the reasonableness of the force used is only a consideration "[i]n making a *lawful* arrest . . . ." *Boseman v. Upper Providence Twp.*, 680 F. App'x 65, 72 (3d Cir. 2017) (quoting *Renk*, 641 A.2d at 293) (emphasis added in *Boseman*). Where an arrest is "unlawful" because it is not supported by probable cause, the arrest constitutes an assault and battery, even if does not injure the plaintiff and the amount of force applied would be necessary to effectuate a lawful arrest. *See id.* (finding "that a jury could conclude that an arrest made without probable [cause] was unlawful, and therefore an assault and battery," even though the plaintiff did not allege that the amount of force used would otherwise have been unreasonable or unnecessary) (citing *Renk*, 641 A.2d at 293-94).

Further, "[a]s other courts within this Circuit have noted, 'Pennsylvania courts have allowed claims of excessive force involving the application of handcuffs to proceed as claims for

assault and battery.'" *Postie v. Frederick*, No. 3:14-CV-00317, 2016 WL 4521855, at *7 (M.D. Pa. Aug. 8, 2016) (quoting *Gibson v. Borough of W. Chester*, No. CIV.A. 02-9089, 2004 WL 203175, at *7 (E.D. Pa. Jan. 12, 2004); citing *Abdullah v. Fetrow*, No. 1:05-CV-1135, 2006 WL 1274994, at *8 (M.D. Pa. May 8, 2006) (internal citation omitted), *report & recommendation adopted by* 2016 WL 4502499 (M.D. Pa. Aug. 29, 2016)).   Thus, even if the jury ultimately finds that Dockery had probable cause to arrest Bishop, it could nonetheless find that he committed assault and battery in the course of doing so.   According to Bishop, Dockery "angrily" ran over to him, repeatedly threatened to take him to jail if he did not produce his identification and, when Bishop turned his back for a moment because he heard his front door open, "grabbed" him by the right hand and pulled it "really, really, really bad up to [his] left shoulder" and "squeez[ed] the handcuffs really tight on [his] hand."  (Bishop Tr., ECF No. 78-1, at 54:18-22).   After he was released, Bishop went to the emergency room because his hand "was in excruciating pain."  (*Id.* at 71:13-15).   The medical staff observed abrasions to his right wrist, provided him minor medical treatment and discharged him.  (Emer. Dep't Rec., ECF No. 78-3, at Ex. 7).   A jury could infer from these facts that Dockery acted with the requisite intent to injure plaintiff.  *See Renk*, 641 A.2d at 293 (defining assault as "an intentional attempt by force to do a[ ] [physical] injury").

Accordingly, the Court will deny summary judgment as to Bishop's assault and battery claim against Dockery.

### D.    Failure to Intervene

Although not explicitly pled, the Court construes the Second Amended Complaint as asserting a claim for failure to intervene against Gieder, Garay and Donohue, as the parties have done in their briefs.  (Memo. in Supp. of Mot. for Summ. J., ECF No. 78, at 23-24; Resp., ECF No. 80, at 10-12; *see also K.A. ex rel. Allebach v. Upper Perkiomen Sch. Dist.*, No. 11-2610,

19

2012 WL 2362565, at *2 (E.D. Pa. Mar. 12, 2012) ("[m]ost relevant are the contents of the complaint and the substantive allegations made," not "technical form [or] the title of a cause of action"), *report & recommendation adopted by* 2012 WL 2362568 (E.D. Pa. June 21, 2012)).  A claim of bystander liability requires the factfinder to determine whether the officer had a realistic and reasonable opportunity to intervene to stop a constitutional violation that took place in his presence, or with his knowledge.  *Yarnall v. Mendez*, 509 F. Supp. 2d 421, 433 (D. Del. 2007) (citing *Smith v. Mensinger*, 293 F.3d 641, 650-51 (3d Cir. 2002)).  The duration of the incident is key to determining whether a reasonable opportunity existed.  *El v. City of Pittsburgh*, 975 F.3d 327, 335 (3d Cir. 2020).  For example, courts have found genuine issues of material fact as to the reasonableness of not intervening where the constitutional violation unfolds in stages or lasts for some duration.  *See Smith*, 293 F.3d at 644, 650 (the plaintiff was "rammed . . . into walls[,] . . . knocked . . . to the floor[,] . . . kicked and punched[,] . . . pulled . . . to his feet," and beaten further) (internal quotation marks omitted); *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995) (use of excessive force lasted for about 15 minutes).  "By contrast, where an incident is momentary, its 'brevity' may 'defeat[ ] [a] . . . failure-to-intervene claim.'"  *El*, 975 F.3d at 335 (quoting *Ricks v. Shover*, 891 F.3d 468, 479 (3d Cir. 2018)); *see Ricks*, 891 F.3d at 479 (brief sexual contact by guard upon inmate ended by the time the inmate called for help).

Defendants contend that Gieder, Garay and Donohue were not close enough to stop Dockery from pulling Bishop's arm too high behind his back or handcuffing him too tightly, even if they had observed these events.  (Memo. in Supp. of Mot. for Summ. J., ECF No. 78, at 23).  Relying on *Rode*, they point out that a defendant in a civil rights case must have had personal involvement in the violation as shown by his or her "personal direction or . . . actual knowledge and acquiescence" and that the plaintiff must make this showing with particularity.  (*Id.* at 24 (citing *Rode*, 845 F.2d at 1207)).  Citing his allegations in the Second Amended

Complaint, Bishop claims that Gieder, Garay and Donohue observed his unlawful arrest and heard his pleas for help and requests to loosen the handcuffs and for medical attention, but simply ignored him. (Resp., ECF No. 80, at 10-11 (quoting Sec. Am. Compl., ECF No. 47, at ¶¶ 23-27)). He argues that a jury may infer knowledge of and acquiescence in the constitutional violation and that liability is not limited to supervisory or superior officers. (*Id.* at 11 (citing and quoting *Smith*, 293 F.3d at 651-52; *Baker*, 50 F.3d at 1193)).

When the events at issue began, Gieder was on the sidewalk on the driver side of Douglas's vehicle, close enough for Dockery, who was standing next to him, to hear Bishop, who had partially exited the passenger side of the vehicle, ask "in a very calm voice" if they could move their patrol cars. (Bishop Tr., ECF No. 78-1, at 47:10-20). He remained there while Dockery repeatedly threatened to take Bishop to jail if he did not produce his identification. (*Id.* at 47:22-53:22). After Dockery handcuffed Bishop on the opposite sidewalk, Gieder walked over to them. (*Id.* at 58:16-17). A jury could find from these facts that Bishop has made a particularized showing that Gieder was aware that Dockery had no basis to arrest[8] Bishop and that Gieder had a realistic and reasonable opportunity to intervene before Dockery made good on his repeated threats to do so if Bishop did not produce identification. *See Boykins v. Ambridge Area Sch. Dist.*, 621 F.2d 75, 80 (3d Cir. 1980) (a civil rights complaint must allege the violative conduct, time, place and those responsible) (citing *Hall v. Pa. State Police*, 570 F.2d 86, 89 (3d Cir. 1978)).

However, Bishop has made no such showing as to Garay and Donohue. Bishop attempts to rely on the allegations in his unverified complaint that Garay and Donohue "watched" the

---

[8] Defendants attempt to construe the manner in which Dockery arrested and handcuffed Bishop as the alleged constitutional violation, but they ignore the fact that an arrest without probable cause itself violates the Fourth Amendment. *Garland*, 2020 WL 2126330, at *5.

arrest and "ignored" his pleas to loosen the handcuffs and for medical care, but these allegations are not evidence.  (Resp., ECF No. 80, at 11; *see Parkell*, 833 F.3d at 320 n.2).  In fact, Bishop testified that he did not know or recall where Garay and Donohue were during the events at issue.  (Bishop Tr., ECF No. 78-1, at 56:19-57:23).  And he never requested that the handcuffs be loosened or that he receive medical treatment until he was taken to the police station, while Garay and Donohue remained behind.  (*Id.* at 62:10-13).

Accordingly, the Court will deny summary judgment on the failure to intervene claim as to Gieder but grant summary judgment as to Garay and Donohue.

### E.      Qualified Immunity

Defendants allege that they are protected from suit by qualified immunity.  Because no claims remain against Garay and Donohue, the Court considers only whether Dockery and Gieder are entitled to qualified immunity.

Qualified immunity provides immunity from suit in situations where a reasonable officer could have believed his conduct was lawful in light of clearly established law.  *See Anderson v. Creighton*, 483 U.S. 635, 636, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Green v. City of Patterson*, 971 F. Supp. 891, 901 (D.N.J. 1997).  The defense provides sufficient room for mistakes in the officer's judgment and serves to protect "all but the plainly incompetent or those who knowingly violate the law."  *Green*, 971 F. Supp. at 901 (quoting *Orsatti*, 71 F.3d at 484) (further citations omitted).  In *Harlow v. Fitzgerald*, the Supreme Court established the standard for invoking a qualified immunity defense, stating that: "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (internal citations omitted).

In *Saucier v. Katz*, the Court refined this standard by formulating a two-pronged inquiry into the officer's conduct: (1) whether, taken in the light most favorable to the plaintiff, the alleged facts indicate the deprivation of an actual constitutional right; and (2) if so, whether the right was clearly established such that a reasonable officer could have believed that the particular conduct at issue was lawful.  533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *overruled in part on other grounds*, *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009); *see also Holmes v. Cnty. of Del.*, No. 04-4794, 2007 WL 954122, at *4 (E.D. Pa. Mar. 28, 2007); *Pagan v. Ogden*, No. 09-00002, 2010 WL 3058132, at *6 (E.D. Pa. July 30, 2010); *Bergdoll v. City of York*, No. 1:08-CV-01879, 2009 WL 25093, at *7-8 (M.D. Pa. Jan. 5, 2009). In *Pearson*, the Supreme Court held that the sequence of the *Saucier* inquiry is not mandatory, and that district courts should exercise their "sound discretion" in determining which prong to address first.  555 U.S. at 236.

The parties' arguments regarding qualified immunity are similar to those made elsewhere in their briefs.  Defendants argue that Dockery did not violate Bishop's clearly established constitutional rights because he had probable cause to demand Bishop's identification due to his disorderly conduct and obstruction and to arrest him when he refused to produce it.  (Memo. in Supp. of Mot. for Summ. J., ECF No. 78, at 25-26).  In addition, they claim that Gieder could not have violated Bishop's clearly established constitutional rights because his only involvement was to transport Bishop to the police station.  (*Id.* at 25).  Bishop reiterates that the Court must accept as true Bishop's, not Defendants', version of events, and in this version Dockery lacked probable cause to arrest Bishop for any crime.  (Resp., ECF No. 80, at 13).  He also contends that Gieder acquiesced in the constitutional violation.  (*Id.*).

The Court has already determined that Bishop has presented evidence that, in arresting him without probable cause, Dockery deprived Bishop of his constitutional rights to be free from

false arrest and false imprisonment.[9]  (*See supra* § IV.A).  Further, "'[t]here is no question that . . . the right to be free from arrest [and imprisonment] except on probable cause, was clearly established' at the time of [Bishop's] arrest."  *Andrews v. Sculli*, 853 F.3d 690, 705 (3d Cir. 2017) (quoting *Orsatti*, 71 F.3d at 483).  Accepting Bishop's facts as true, Gieder failed to intervene to stop this clearly unconstitutional arrest and participated in the clearly unconstitutional detention of Bishop when he drove him in his patrol car to the police station. Accordingly, the Court denies summary judgment as to Dockery and Gieder's qualified immunity defense.

## V.   CONCLUSION

For the foregoing reasons, the Court grants summary judgment in favor of Upper Darby Township, Garay and Donohue on all claims against them.  In addition, the Court grants summary judgment on the false arrest and malicious prosecution claims against Gieder.  The Court denies the motion in all other respects.

BY THE COURT:

   /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge

---

[9]  Bishop's malicious prosecution and assault and battery claims derive from Pennsylvania law, not the United States Constitution.  (*See supra* §§ IV.B-C).